986 A.2d 63

COUNCIL 13, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL–CIO by its Trustee Ad Litem, David R. FILLMAN; and Richard Conway; Samuel Deitch; Randy Lash; Robenna Mitchell; and Pennsylvania Social Services Union, Local 688 of the Service Employees International Union, by its Trustee Ad Litem, Kathy Jellison and Federation of State Cultural and Educational Professionals, AFT, Local 2382, by its Trustee Ad Litem, Stephen Fisher, Appellants

v.

Commonwealth of Pennsylvania; The Honorable Edward G. RENDELL, Governor of the Commonwealth of Pennsylvania; Naomi Wyatt, Secretary of Administration; Mary A. Soderberg, Secretary of Budget; and Robin L. Wiessmann, Treasurer of the Commonwealth of Pennsylvania, Appellees

Council 13, American Federation of State, County And Municipal Employees, AFL–CIO by its Trustee Ad Litem, David R. Fillman; and Richard Conway; Samuel Deitch; Randy Lash; Robenna Mitchell; and Pennsylvania Social Services Union, Local 688 of the Service Employees International Union, by its Trustee Ad Litem, Kathy Jellison and Federation of State Cultural and Educational Professionals, AFT, Local 2382, by its Trustee Ad Litem, Stephen Fisher

v.

Commonwealth of Pennsylvania; The Honorable Edward G. Rendell, Governor of the Commonwealth of Pennsylvania; Naomi Wyatt, Secretary of Administration; Mary Soderberg, Secretary of Budget; and Robin L. Wiessmann, Treasurer of the Commonwealth of Pennsylvania.

Cross Appeal of Commonwealth of Pennsylvania, The Honorable Edward G. Rendell, Governor of the Commonwealth of Pennsylvania; Naomi Wyatt, Secretary of Administration; Mary A. Soderberg, Secretary of Budget.

Supreme Court of Pennsylvania.

Argued Sept. 16, 2009.

Decided Dec. 28, 2009.

354

356

Thomas W. Corbett, for Commonwealth of Pennsylvania.

Frank A. Fisher, Jr., PA Office of Administration, Linda Cadden Barrett, PA Office of General Counsel, Gregory Eugene Dunlap, PA Governor's Office of General Counsel, for Hon. Rendell, Governor, Naomi Wyatt, Mary Soderberg.

Brian D. Zweiacher, PA Governor's Office of General Counsel, for Michael Masch.

Leonidas Pandeladis, Gerald Stuart Smith, PA Treasury Department, for Rob McCord.

Amy Louise Rosenberger, Bruce Michael Ludwig, John R. Bielski, Alaine S. Williams, Willig, Williams & Davidson, Philadelphia, for Council 13, American Federation of State, City & Municipal Employees, AFL–CIO, Pennsylvania Social Services Union, Local 688 of the Service Employees International Union, Federation of State Cultural and Educational Professionals, AFT, Local 2382.

Joshua David Funk for Amicus Curiae Senators Jeffrey Piccola, John Gordner & Jane Earll.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## *OPINION*

Chief Justice CASTILLE.

We consider here whether the Commonwealth Court correctly declared that Article III, Section 24 of the Pennsylvania Constitution ("Section 24"), PA. CONST. art. III, § 24, is not preempted by the Fair Labor Standards Act of 1938 ("FLSA" or "Act"),[1] and that accordingly, Section 24 prohibits the Governor of the Commonwealth from paying the wages of state employees who are covered by FLSA and required to work from monies in the Commonwealth's Treasury, but not yet appropriated by the General Assembly. For the following reasons, we conclude that this matter is justiciable; that under the Supremacy Clause of the United States Constitution, U.S. CONST art. VI, cl. 2, Section 6 of FLSA preempts Section 24; and that Appellants/Cross–Appellees are entitled to the declaratory judgment they requested. Therefore, in the appeal at No. 60 MAP 2008, we reverse the Commonwealth Court's Order. In the cross-appeal at No. 66 MAP 2008, we affirm the Commonwealth Court's Order in part and dismiss the cross-appeal in part as moot.

I

By way of background, these cross-appeals arise from the process by which the Commonwealth's yearly budget and budget appropriations are adopted and the consequences of a failure to timely discharge those duties. The Commonwealth's fiscal year begins on July 1st of each calendar year and ends on June 30th of the next calendar year. 71 P.S. § 237(a). Article VIII, Section 12 of our Constitution directs the Governor to submit an annual budget for the General Assembly's consideration at a time set by law; Article VIII, Section 13 requires the General Assembly to adopt the budget for the ensuing fiscal year and to make operating budget appropriations. PA. CONST. art. VIII, §§ 12, 13. Under Section 24, the

1. Act of June 25, 1938, c. 676, § 1, 52 Stat. 1060, as amended, 29 U.S.C. § 201 *et seq.* Although not expressly stated in the Commonwealth Court's Order, it is FLSA's minimum wage provision in Section 6, 29 U.S.C. § 206(a), that was placed at issue in this case.

General Assembly's budget appropriations are an essential prerequisite to expending money from the Commonwealth's Treasury; that is, without such appropriations, state monies, for the most part, may not be spent. Section 24 provides:

No money shall be paid out of the treasury, except on appropriations made by law and on warrant issued by the proper officers; but cash refunds of taxes, licenses, fees, and other charges paid or collected, but not legally due, may be paid, as provided by law, without appropriation from the fund into which they were paid on warrant of the proper officer.

PA. CONST. art. III, § 24.

For each fiscal year, the General Assembly enacts a general appropriations act, so that state funds are available to the Executive, Legislative, and Judicial branches of the Commonwealth for the payment of, *inter alia,* the salaries and wages of state employees. *See* PA. CONST. art. III, § 11 ("The general appropriations bill shall embrace nothing but appropriations for the executive, legislative and judicial departments of the Commonwealth, for the public debt and for public schools. All other appropriations shall be made by separate bills, each embracing but one subject."). *See, e.g.,* General Appropriation Act of 2007 ("GAA 2007") § 104(a) ("The following sums set forth in this act . . . are specifically appropriated from the General Fund to the several hereinafter named agencies of the Executive, Legislative and Judicial Departments of the Commonwealth for the payment of salaries, wages or other compensation and travel expenses . . . and for payment of any other expenses as provided by law or by this act, necessary for the proper conduct of the duties, functions and activities . . . set forth for the fiscal year beginning July 1, 2007 . . . .").

At the end of each fiscal year on June 30, except in limited circumstances, money that was appropriated, but not spent, committed or encumbered, lapses back to the fund from which it came. *See, e.g.,* GAA 2007 § 1906 ("[E]xcept as otherwise provided by law . . . that part of all appropriations [made in this act] . . . unexpended, uncommitted or unencumbered as of

June 30, 2008, shall automatically lapse as of that date."). Accordingly, if the General Assembly does not enact a general appropriations act by July 1 of each year, except for those funds that have not lapsed, Section 24 prohibits money from being paid out of the State Treasury to the Commonwealth's Executive, Legislative, and Judicial branches, which consequently prevents the payment of wages to state employees.

In this case, the salient facts are undisputed. The Commonwealth's 2007–2008 fiscal year began on July 1, 2007, and was to end on June 30, 2008. On February 5, 2008, Governor Edward G. Rendell submitted a proposed budget for fiscal year 2008–2009 for the General Assembly's consideration. The Governor also devised a plan as to what payments of wages and salaries to Commonwealth employees the State Treasury would or would not make in the event that the General Assembly did not enact a general appropriations act by June 30, 2008.

The plan was reflected in an Interagency Agreement entered by the Office of the Governor and the State Treasury Department on May 22, 2008. In relevant part, the Interagency Agreement stated that because FLSA "requires that employers, including the Commonwealth, pay certain employees wages and salaries in a timely manner" and Section 24 "requires that '[n]o money shall be paid out of the treasury, except on appropriations made by law and on warrant issued by the proper officers[,]' "

the Administration has concluded that without the enactment of an Operating Budget, (1) employees covered by the FLSA whose duties are not necessary to insure the health, safety and welfare of the citizens, cannot be permitted to perform their duties since the Commonwealth has no authority to make payments to those employees; (2) employees whose duties are necessary to insure the health, safety and welfare of the citizens must continue to perform their duties and, notwithstanding the Constitutional prohibition against payments, those employees who are covered by the FLSA must be paid in a timely manner; (3) employees not covered by the FLSA may continue to perform their duties

and may be paid in arrears when an Operating Budget is enacted; and (4) employees paid from sources other than an Operating Budget may continue to perform their duties and may be paid in a timely manner.

Petition for Review in the Nature of a Declaratory Judgment ("Petition"), Exhibit D, Interagency Agreement at 2–3. Therefore, as to the payment of payroll obligations in the event that no budget was enacted by June 30, the Interagency Agreement provided:

> From and after July 1, Treasury shall make timely payments for wages and salaries to (a) Commonwealth employees necessary to insure the health, safety and welfare of the citizens of Pennsylvania who are covered by the FLSA, and (b) Commonwealth employees paid from sources other than an Operating Budget. Commonwealth employees not covered by the FLSA and not paid from sources other than the Operating Budget shall be paid in due course, in arrears, following the enactment of an Operating Budget. The Administration shall not submit requests to Treasury for payments to any employees other than those listed in clauses (a) and (b) of this paragraph prior to enactment of an operating Budget.

*Id.* at 4.

On June 6, 2008, Secretary of Administration Naomi Wyatt sent the Interagency Agreement to Commonwealth agency heads and informed them of the responsibility to categorize agency employees according to the principles stated therein and to assign one of four codes to each employee as follows:

**Code 1—FLSA Covered Critical:** Positions who perform functions essential to protect the health, safety and welfare of the public. Examples include State Police Officers, Corrections Officers, nurses in veterans' homes and state hospitals, and emergency management personnel. *These employees will work and will be paid on time.*

**Code 2—FLSA Covered Non–Critical:** Position[s] performing important work, but which are not critical to the health, safety and welfare of citizens. Examples include

clerks who process drivers' licenses and motor vehicle re-
newals, maintenance staff at state parks who maintain,
repair and renovate buildings, financial examiners who re-
view records for compliance with regulations, Civil Service
staff who conduct civil service testing. *These employees
will be furloughed.*

**Code 3—FLSA Exempt:** These are employees who are not
covered by the wage and hour provisions of the federal Fair
Labor Standards Act. Generally, these are executives, em-
ployees in policy positions, attorneys and employees in
similar positions. *These employees will work but will not be
paid until after a budget has been passed.*

**Code 4—Special Funded:** Positions not affected by a bud-
get impasse because they are paid from special funds that
are permanently or continually appropriated via their en-
abling acts and that do not fall under the General Appropri-
ations Act.... *These employees will work and will be paid
on time.*

*Id.* at 1–2 (emphasis in original).

In June of 2008, in accordance with the Interagency Agree-
ment, Commonwealth agencies began preparing to furlough
those employees who were categorized as "FLSA Covered
Non–Critical." Appellants Richard Conway, Samuel Deitch,
Randy Lash, and Robenna Mitchell, all Commonwealth em-
ployees, were categorized as "FLSA Covered Non–Critical"
and informed that they might be furloughed on July 1, 2008, if
the General Assembly did not pass a budget for the upcoming
fiscal year.

On June 19, 2008, these individuals and Council 13, Ameri-
can Federation of State, County and Municipal Employees,
AFL–CIO, Pennsylvania Social Services Union, Local 668 of
the Service Employees International Union, Federation of
State Cultural, and Educational Professionals, AFT, Local
2382, three unions representing approximately 16,000 state
employees who were also assigned to the "FLSA Covered
Non–Critical" category (collectively, the "Union Parties"), filed
the underlying Petition and an Application for Summary Re-

lief [2] in the Commonwealth Court's original jurisdiction against the Commonwealth, Governor Rendell, Secretary of Administration Wyatt, Mary A. Soderberg, the Commonwealth's Secretary of Budget, and Robin L. Wiessmann, the Commonwealth's Treasurer.

The Union Parties asserted that Section 6 of FLSA [3] preempts Article III, Section 24 of the Pennsylvania Constitution. Therefore, according to the Union Parties, the view held by the Governor and others in the Administration that Section 24 bars the Commonwealth from continuing to employ and pay all FLSA-covered employees, if a general appropriations act is not enacted by the start of the Commonwealth's new fiscal year, was erroneous as a matter of law. While the Union Parties did not challenge the classifications that had been made of Commonwealth employees or the Governor's authority to furlough employees, they requested a declaratory judgment that "Article III, Section 24 does not prohibit the Commonwealth from continuing to employ and pay all FLSA nonexempt Commonwealth employees in the event that the Pennsylvania Legislature fails to pass a budget by July 1, 2008." Petition at 19.

On June 23, 2008, the Commonwealth, the Governor, the Secretary of Administration, and the Secretary of Budget (collectively, the "Executive Parties") filed a joint Answer and New Matter to the Petition and an Answer to the Application for Summary Relief. On that same day, the Treasurer, represented separately, filed an Answer and New Matter to the Petition and Answer to the Application for Summary Relief. On June 25, 2008, the Executive Parties filed a Cross–Applica-

**2.** The Pennsylvania Rules of Appellate Procedure provide:
At any time after the filing of a petition for review in an appellate or original jurisdiction matter the court may on application enter judgment if the right of the applicant thereto is clear.
Pa.R.A.P. 1532(b).

**3.** Section 6 of FLSA states in relevant part that "[e]very employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following [minimum] rates[.]" 29 U.S.C. § 206(a).

tion for Summary Relief, asking that the Commonwealth Court dismiss the Petition as non-justiciable or, alternatively, that the court:

> (1) find that when appropriations have not been enacted into law as required by Section 24, the Governor has the authority ... to temporarily furlough employees he determines are critical to maintaining the basic health, safety and welfare of the public where the Commonwealth otherwise would be legally liable under the FLSA or [*Council 13, American Federation of State, County, and Municipal Employees, AFL–CIO v. Casey*, 156 Pa.Cmwlth. 92, 626 A.2d 683 (1993) ] to make payments for salaries and wages for which there are no appropriations; and

> (2) declare that there is no state law that obligates or allows the Governor to permit Commonwealth employees to report for work to earn compensation, which under the FLSA and *Casey* would result in the Commonwealth's obligation to pay fully and on time, notwithstanding the fact that there are no appropriations enacted by law that would constitutionally authorize the payment of such compensation; and that to do so would be an erosion of the express language of Article III, Section 24 of the Pennsylvania Constitution.

Cross Application for Summary Relief at 15–16. On June 26, 2008, the Union Parties filed an Answer to the New Matter of the Executive Parties and to the New Matter of the Treasurer, and on July 9, 2008, responded to the Cross–Application for Summary Relief.[4]

Following oral argument, on July 23, 2008, the Commonwealth Court issued a single-judge Memorandum Opinion and Order, denying the Union Parties' Application for Summary Relief, denying in part and granting in part the Executive Parties' Cross–Application for Summary Relief, and entering a declaratory judgment. The Memorandum Opinion was desig-

4. The Executive Parties point out that the Governor did not invoke the Interagency Agreement on July 1, 2008, having determined that since a general appropriations act was going be enacted before the payment of wages for work done by Commonwealth employees in the new fiscal year were due, the Commonwealth would avoid allegations of unpaid minimum wages or a demand for liquidated damages under FLSA.

nated as a published Opinion on August 12, 2008. *Council 13, American Federation of State, County, and Municipal Employees, AFL–CIO v. Commonwealth,* 954 A.2d 706 (Pa. Cmwlth.2008).[5]

In considering FLSA's preemptive effect on Section 24, the Commonwealth Court began by referring to the prior decision in *Casey,* another single-judge opinion. In *Casey,* President Judge Craig concluded that:

> [W]hen state employees are required to work at the performance of their job duties, the [FLSA] mandates that the Commonwealth ... *shall pay to such employees ... their regular salaries and wages from monies actually in the treasury,* even though the pertinent fiscal year appropriation line item has been exhausted, because the federal [FLSA], 29 U.S.C. § 206 governs, prevailing by virtue of the Supremacy Clause of the United States Constitution over PA. CONST. art. III, § 24 that requires Pennsylvania legislative appropriation authorization for payments by the Commonwealth.

*Id.* at 712 (quoting *Casey,* 626 A.2d at 687 (emphasis added)).[6] The court then proceeded to determine whether it should

5. Preliminarily, the Commonwealth Court ruled that this matter was moot because the General Assembly enacted a general appropriations act on July 4, 2008. Nonetheless, the court declined to dismiss the Petition, concluding that the issue presented in the Petition was capable of repetition, and thus, fell within an exception to the mootness doctrine. 954 A.2d at 709 n. 2. No party in these cross-appeals has challenged the court's determinations in this regard.

6. In *Casey,* in early May of 1993, the Executive Branch notified two unions that at least eight Executive branch agencies would not have sufficient appropriations authority under the general appropriations act for the fiscal year 1992–1993 to meet payroll obligations by the end of the month. The Governor also announced that all affected employees were expected to continue working, even though they could not be paid under Section 24. Arguing the applicability and supremacy of FLSA, the unions and several individual Commonwealth employees filed a petition for review in the Commonwealth Court against Governor Casey and the Secretary of Budget, seeking to compel the payment of wages and salaries to Commonwealth employees who were required to work despite the expected exhaustion of the pertinent salary appropriations line items.

follow *Casey*'s holding.[7]

Because the *Casey* court relied on *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), the decision in which the U.S. Supreme Court overruled its prior decision in *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), and concluded that Congress' imposition of FLSA's standards upon state and local employers was constitutional, the court below engaged in a "review of the U.S. Supreme Court's jurisprudence in the areas of the FLSA and federalism." 954 A.2d at 712.[8] After discussing *National League of*

The Commonwealth Court granted the petitioners the relief they sought, concluding that FLSA applies to the States; that FLSA requires the payment of wages in a timely fashion; and that under the Supremacy Clause, Section 24 is preempted. 626 A.2d at 685–86. At the same time, the court found that although Section 16 of FLSA provides for the payment of liquidated damages by an employer who violates the Act, the imposition of such liability was not applicable in view of the diligence with which the Executive had approached the budget impasse. *Id. See* 29 U.S.C. § 260 ("[I]f the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA] ... the court may, in its sound discretion, award no liquidated damages....").

7. Notably, Section 414 of the Commonwealth Court's Internal Operating Procedures provides that a "single judge opinion, even if reported, shall be cited only for its persuasive value, not as binding precedent." *See* 210 Pa.Code § 67.55.

8. In *National League of Cities*, the U.S. Supreme Court held that the Commerce Clause did not empower Congress to enforce the minimum wage and overtime provisions of FLSA against the States in areas of traditional governmental functions. The Court reasoned that these provisions would impermissibly interfere with the States' separate and independent existence in such areas. 426 U.S. at 851, 96 S.Ct. 2465.

In overruling *National League of Cities*, the *Garcia* Court stated:
Our examination of [*National League of Cities'*] "function" standard applied in [federal and state] cases over the last eight years now persuades us that the attempt to draw the boundaries of state regulatory immunity in terms of "traditional governmental function" is not only unworkable but is also inconsistent with established principles of federalism and, indeed, with those very federalism principles on which *National League of Cities* purported to rest. That case, accordingly, is overruled.
469 U.S. at 531, 105 S.Ct. 1005. The Court then held that it could "perceive nothing in the overtime and minimum-wage requirements of

*Cities* and *Garcia* at some length, the court expressed the belief that "since *Garcia*, the Supreme Court has returned to the principles of *National League of Cities*," by "repeatedly abrogat[ing] attempts by Congress to use the commerce power in a way that interferes with State sovereignty." *Id.* at 713 (citations omitted). Based on its view that respect for state sovereignty had been restored, the court determined that the "core assumption in *Casey* that the provisions of the FLSA are applicable to the States is not a secure assumption[,] but, rather, a doubtful one given the way Supreme Court jurisprudence has developed since *Casey.*" *Id.* at 714.

The court next reasoned that even if FLSA was applied to Commonwealth employees, *Casey*'s conclusion that FLSA required that state employees be paid on time was unwarranted because "[t]he language of the FLSA does not support such a conclusion." *Id.* Rejecting the decisions of several federal courts that have held that Section 6 of FLSA requires the timely payment of wages to employees, the court stated: "[T]he FLSA establishes minimum wage and overtime standards; it says nothing about the length or frequency of a pay period. The requirement that the FLSA requires timely payment of wages is one of judicial interpretation." *Id.*

The court further reasoned that in the event that FLSA requires the payment of wages to Commonwealth employees on time, Section 24 was not nullified with respect to FLSA-covered employees because Congress did not address the payment of wages during a budget impasse and could not have intended the unlawful payment of monies out a State's treasury in such circumstances. *Id.* at 715. For these reasons, the court declined to follow *Casey* and held:

> [T]here exists no conflict between the FLSA and Article III, Section 24: the two provisions address different concerns.

the FLSA, as applied to [the public employer], that is destructive of state sovereignty or violative of any constitutional provision. [The public employer] faces nothing more than the same minimum-wage and overtime obligations that hundreds of thousands of other employers, public as well as private, have to meet." *Id.* at 554, 105 S.Ct. 1005.

Congress did not intend the FLSA to authorize public employers to raid their treasuries illegally any more than it intended that private employers could rob banks, whenever necessary to make payroll on time. In sum, the Court holds that the FLSA does not preempt Article III Section 24 of the Pennsylvania Constitution.

*Id.* at 716 (footnotes omitted).

The court then considered the parties' filings. First, the court addressed the argument raised by the Executive Parties and the Treasurer that the Petition presented a non-justiciable, political question and should be dismissed. The court disagreed, concluding that the Union Parties did not seek to direct the political choices the Governor should make when faced with a budget impasse, but instead, properly sought a declaration of law. Accordingly, the court refused to dismiss the Petition. Based on its holding that Section 24 was not preempted by FLSA, the court denied the Union Parties' Application for Summary Relief. The court also denied the request in the Executive Parties' Cross–Application for Summary Relief that the court approve a minimal violation of Section 24 to pay FLSA-covered critical employees, as beyond a court's power to approve. Since the Governor's authority to furlough was undisputed and in the court's view, established as a matter of law, the court granted the Executive Parties' request in their Cross–Application for Summary Relief for a declaration that the Governor is authorized to furlough employees for lack of funds. Lastly, the court entered the following declaratory judgment:

Article III, Section 24 of the Pennsylvania Constitution is not preempted by the federal Fair Labor Standards Act, 29 U.S.C. §§ 201–219; therefore, when state employees are required to work at the performance of their job duties after the pertinent fiscal year appropriation line item for their salaries and wages has been exhausted, the Governor is not required to pay, and is in fact prohibited from paying, those employees their regular salaries and wages from

monies actually in the treasury but not yet appropriated by the General Assembly.

*Id.* at 718.

The Union Parties filed a direct appeal in this Court from the Commonwealth Court's Order. The Executive Parties filed a cross-appeal.[9]

## II

■ We address the issue of justiciability first.[10] The Treasurer and the Executive Parties contend that the Commonwealth Court erred by not dismissing the Petition as non-justiciable based on the political question doctrine. The Treasurer asserts that since all the parties in the instant case agree that the Governor has the unfettered discretion to furlough state employees in the event that a general appropriations act is not enacted, the manner as to how he exercises that discretion becomes a purely political issue and is irrelevant for declaratory judgment purposes under the Declaratory Judgment Act. The Treasurer also contends that a declaratory judgment in this case accomplishes no judicial purpose since it

9. Our jurisdiction is secure. Section 723 of the Judicial Code states that "[t]he Supreme Court shall have exclusive jurisdiction of appeals from final orders of the Commonwealth Court entered in any matter which was originally commenced in the Commonwealth Court except an order entered in a matter which constitutes an appeal to the Commonwealth Court from another court, a magisterial district judge or another government unit." 42 Pa.C.S. § 723(a).

10. We treat the issue of justiciability as a threshold matter; that is, if raised, we resolve justiciability before we consider the question presented on the merits. *See e.g., Pa. Sch. Bds. Ass'n, Inc. v. Commonwealth Ass'n of Sch. Adm'rs,* 569 Pa. 436, 805 A.2d 476, 484 (2002). In the instant action, the Commonwealth Court should have decided the justiciability of the request for declaratory relief made in the Petition before deciding whether Section 24 is preempted by the FLSA. Since the court ultimately determined that the issue raised in the Petition was justiciable, the court's approach in this regard is of no moment.

The issue of justiciability raises a question of law. *See Zemprelli v. Daniels,* 496 Pa. 247, 436 A.2d 1165, 1169 (1981) ("The decision as to whether a claim presents a non-justiciable political question is the responsibility of this Court as ultimate interpreter of the Constitution.") Therefore, our standard of review is *de novo* and our scope of review is plenary. *Clifton v. Allegheny County,* 600 Pa. 662, 969 A.2d 1197, 1209 n. 17 (2009).

has no impact on the Governor's furlough decisions and only inserts the Pennsylvania courts into a controversial political dispute. The Executive Parties argue that in filing the Petition, the Union Parties sought to intrude upon the prerogatives and constitutional powers of the Governor as the Commonwealth's chief executive officer to determine who can work and be paid during a budget impasse.

The Union Parties counter that the issue they raise in their Petition is a pure question of law. The Union Parties ask this Court to decide whether the Executive Parties and the Treasurer were correct in their view that Section 24 prevented the payment of wages to the Commonwealth's FLSA-covered employees, if the General Assembly failed to adopt budget appropriations by July 1, 2008, such that the Governor's decision to furlough certain of those employees was legally justifiable. The Union Parties emphasize that they had, and presently have, no interest in dictating the Governor's furlough decisions, and they readily concede the Governor's authority to make whatever furlough decisions he deems fit.

As this Court noted in *Sweeney v. Tucker*, 473 Pa. 493, 375 A.2d 698 (1977), a basic precept of our form of government is that the Executive, the Legislature, and the Judiciary are independent, co-equal branches of government. *Id.* at 705. As we further noted, while the dividing lines among the three branches "are sometimes indistinct and are probably incapable of any precise definition[,]" under the principle of separation of the powers of government, no branch should exercise the functions exclusively committed to another branch. *Id.* The political question doctrine is generally considered to derive from the principle of separation of powers. Under the doctrine, the courts will not review the actions of another branch of government where the constitution entrusts those actions to that other branch. *Id.*

In evaluating whether there is a political question in a case such that a court should refrain from deciding, we are guided by the standards the U.S. Supreme Court discussed in *Baker*

*v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the seminal case in the area. In *Baker,* the High Court stated:

Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217, 82 S.Ct. 691, *quoted in Sweeney,* 375 A.2d at 706.

Our Constitution commits certain functions to the Governor and other functions to the Pennsylvania Courts. Under Article IV, Section 2 of our Constitution, "[t]he supreme executive power shall be vested in the Governor, who shall take care that the laws be faithfully executed...." PA. CONST. art. IV, § 2. Under Article V, Section 1, the "judicial power of the Commonwealth shall be vested in a unified judicial system...." PA. CONST. art. V, § 1. In *Thornburgh v. Lewis,* 504 Pa. 206, 470 A.2d 952 (1983), we spoke to these constitutional roles, when we rejected the contention that the issue as to whether the Governor was required to give the Chairman of the Senate Appropriations Committee certain requested budget information was a political question that we should not consider. We stated:

It is the province of the Judiciary to determine whether the Constitution or laws of the Commonwealth require or prohibit the performance of certain acts. That our role may not extend to the ultimate carrying out of those acts does not reflect upon our capacity to determine the requirements of the law. The [Chairman] asks the Court to direct the Governor to supply him with certain budgetary data. A decision that the Governor is required, or is not required, to

do so would in no way involve the Judiciary in the role assigned to the General Assembly of enacting a budget, or in the role assigned to the Governor of preparing and approving a budget. It would merely determine the meaning of Constitutional and statutory provisions, precisely the role of the Judiciary in our tri-partite system of government.

*Id.* at 955. Further, in dismissing the argument that the case would be impossible to decide " 'without an initial policy determination of a kind clearly for nonjudicial discretion[,]' " and that a decision on the part of this Court would intrude into areas of legislative or executive decision-making, we reasoned:

> The only question presented is whether the information sought is information which, by law, the [Chairman] is entitled to request and the [Governor and his General Counsel] are required to supply. Presented thus, the question does not implicate standards beyond the scope of judicial management, nor does its resolution require a prior determination of policy of a nature clearly within the realm of nonjudicial discretion.
>
> * * * *
>
> The Appellants may not remove a claim from consideration by the Courts simply by raising the specter of judicial interference with legislative or executive discretion, or by claiming for themselves the power to interpret the limits of their Constitutional and statutory powers and duties. This Court will refrain from resolving a dispute where to do so would necessarily involve it in carrying out functions properly delegated to a separate branch of government. We will not refrain from resolving a dispute which involves only an interpretation of the laws of the Commonwealth, for the resolution of such disputes is our constitutional duty.

*Id.* at 956.

■ Based on these principles, we hold that the issue raised in the Union Parties' Petition does not implicate the political question doctrine and, thus, is justiciable. The Union Parties

do not ask the Commonwealth Court to make the Governor's furlough decisions or other policy determinations for him. Rather, they ask the court to interpret and declare the law, a function our Constitution assigns to the Pennsylvania Courts. That is, as individuals or representatives of individuals who had been affected in their employment status by the Governor's reliance on Section 24 for his furlough decisions, the Union Parties filed a declaratory judgment action, asking the Commonwealth Court to construe Section 6 of FLSA, consider its interaction with Section 24 of the Pennsylvania Constitution under preemption principles, and declare that Section 24 did not, as the Governor had asserted, prohibit their continued employment and the payment of their wages. *See* 42 Pa.C.S. § 7541 ("This [declaratory judgment] subchapter is declared to be remedial. Its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations, and is to be liberally construed and administered.").

The happenstance that the preemption issue the Union Parties posed to the court arises in political circumstances, when a budget impasse was looming and the Governor was announcing furlough options and decisions, does not change the nature of the jurisprudential issue from one of law that the courts are to decide, to one of executive policy that the courts are not to consider. As we instructed in *Thornburgh*, the political question doctrine is a shield, not a sword. The doctrine exists to protect the Executive branch from intrusion by the courts into areas of political policy and executive prerogative; it does not exist to remove a question of law from the Judiciary's consideration merely because the Executive branch has forwarded its own opinion of the legal issue in a political context. Accordingly, we conclude that the Commonwealth Court correctly refused to dismiss the Petition as nonjusticiable.

### III

We now turn to the merits of the Union Parties' appeal. The Union Parties raise each of the issues that the Common-

wealth Court addressed in arriving at its decision not to follow the prior decision in *Casey* and to deny declaratory relief. First, the Union Parties contend that the Commonwealth Court erred in questioning *Garcia*'s viability and in suggesting that the wage provisions of FLSA may not apply to the Commonwealth. The Union Parties argue that because the Supreme Court's decision in *Garcia* has not been overruled, *Garcia*'s holding that state and local employees are covered by FLSA is controlling. Second, the Union Parties assert that the Commonwealth Court erred in concluding that Section 6 of FLSA does not mandate that covered employees be paid their wages on time. They argue that the Commonwealth Court's out-of-hand rejection of federal court decisions that have construed FLSA to require the timely payment of wages, simply because Section 6 does not explicitly state such a requirement, was erroneous. Third, the Union Parties claim that the Commonwealth Court erred in not finding that Section 24 is preempted by FLSA. They argue that the Commonwealth Court failed to apply the appropriate federal preemption analysis to discern Congress' preemptive intent and failed to recognize that since Section 24 conflicts with Section 6, Section 24 must give way.

In response, the Executive Parties do not dispute that public employers are to abide by FLSA's wage provisions. Echoing the Commonwealth Court, they nonetheless question whether lower federal court interpretations of Section 6 that conclude that an employer must pay wages on schedule ought to be followed since Congress did not expressly instruct employers to do so, and they suggest that reasonable delays in wage payment are tolerated under FLSA. With regard to Section 6's preemptive effect, the Executive Parties rely on the absence of expressly preemptive language in FLSA and on the traditional presumption against preemption that is applied in federal preemption cases. They assert that while state law certainly may be preempted under the Supremacy Clause, the presumption against preemption must be respected here, where Congress has not used explicit language in Section 6 to impose a timely wage payment requirement on the States that

would operate in direct contravention of the clear mandate in Section 24.

In determining whether the Union Parties are correct that they are entitled to a declaration that Section 24 did not prohibit the Commonwealth from employing and paying all FLSA-covered employees in the event of a budget impasse, we must first consider whether the Commonwealth is obligated to adhere to the wage requirements of FLSA, and if so, whether Section 6 of the Act contains a timely wage payment mandate or contemplates that the payment of wages may be delayed. If we conclude that FLSA includes a timely wage payment mandate, we must then consider whether Section 6 preempts Section 24, such that Section 24 should not have been relied upon to justify the Governor's furlough decisions in June of 2008. We consider these issues *seriatim*.[11]

## A

■ The Commonwealth Court concluded that the U.S. Supreme Court's holding in *Garcia*, which established the constitutionality of imposing FLSA's wage standards on public employers, is in doubt. It is fundamental that by virtue of the Supremacy Clause, the State courts are bound by the decisions of the Supreme Court with respect to the federal Constitution and federal law, and must adhere to extant Supreme Court jurisprudence. U.S. CONST. art. VI, cl.2;[12] *Chesapeake & O. Ry. Co. v. Martin*, 283 U.S. 209, 221, 51 S.Ct. 453, 75 L.Ed. 983 (1931). ("The determination by this [C]ourt of [a federal] question is binding upon the state courts, and must be followed, any state law, decision, or rule to the contrary notwithstanding."); *Commonwealth v. Ware*, 446 Pa. 52, 284 A.2d 700, 702 (1971) ("[A] state court is not free to ignore the dictates of the United States Supreme Court on federal consti-

11. These issues raise questions of law. Our standard of review is *de novo* and our scope of review is plenary. *Clifton*, 969 A.2d at n. 17.

12. The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl.2.

tutional matters because of its own conclusion that those dictates are 'ill-considered.' ").

■■ In *Garcia*, the Supreme Court held that "Congress' action in affording [certain state and local] employees the protections of the wage and hour provisions of the FLSA contravened no affirmative limit on Congress' power under the Commerce Clause." 469 U.S. at 555–56, 105 S.Ct. 1005. *Garcia* has not been overruled. As the Supreme Court's pronouncement on the federal question it addressed, under the Supremacy Clause, *Garcia* is the law of the land, binding upon the State courts and not open to challenge. Particularly where governing precedent exists, the Commonwealth Court was obliged to apply existing law, not to anticipate how the law might change. Thus, we conclude that the Commonwealth Court erred in questioning whether *Garcia* should be followed and, correspondingly, erred in viewing as open the question of whether the Commonwealth must be viewed as subject to FLSA's wage provisions.

### B

Having concluded that FLSA and its wage provisions apply to the Commonwealth, we next consider whether as a matter of statutory construction, Section 6 of FLSA requires the Commonwealth to pay wages timely. The Supreme Court has not yet ruled on this issue. However, several lower federal courts have done so and have concluded that Section 6 requires that an employee's wages be paid in a timely fashion. While the decisions of the lower federal courts addressing the construction and interpretation of federal statutes do not bind this Court, we have looked to them for guidance. *Krentz v. Consol. Rail Corp.*, 589 Pa. 576, 910 A.2d 20, 34 & n. 16 (2006).

In particular, we find the majority opinion issued by the Court of Appeals for the Ninth Circuit in *Biggs v. Wilson*, 1 F.3d 1537 (9th Cir.1993), *cert. denied*, 510 U.S. 1081, 114 S.Ct. 902, 127 L.Ed.2d 94 (1994), to be instructive. There, California state law prohibited the release of paychecks until a budget was approved by the Legislature and signed by the

Governor. Due to a budget impasse, certain highway mainte-
nance workers were not paid wages on their scheduled pay-
day. The wages were paid about 15 days later, after the
budget was passed and signed into law. The workers brought
a federal suit against several state officials, alleging a violation
of Section 6 of FLSA, and requesting declaratory and injunc-
tive relief and liquidated damages on account of the delay in
receiving their wages. The district court concluded that
FLSA requires that wages be paid promptly, found that in
light of the circumstances presented, this requirement was not
met, and declared that the state officials violated FLSA by not
timely paying the workers their wages. The state officials
appealed, contending, *inter alia*, that the Congress did not
intend a prompt payment requirement in FLSA and that only
nonpayment, not late payment, is prohibited by the Act.

On appeal, the Ninth Circuit affirmed the district court.[13]
While mindful that FLSA does not expressly require that
wages be paid on time, the court nonetheless concluded that
the Act requires prompt payment by implication, based on its
structure and the Supreme Court's "directive that [FLSA] is
to be liberally construed to apply to the furthest reaches
consistent with Congressional direction[.]" *Id.* at 1539 (citing
*Mitchell v. Lublin, McGaughy & Assoc.,* 358 U.S. 207, 211, 79
S.Ct. 260, 3 L.Ed.2d 243 (1959)).

**13.** In addition to holding that the state officials' failure to issue the
workers' paychecks promptly violated FLSA, the Ninth Circuit stated:
"Paychecks are due on payday. After that, the minimum wage is
'unpaid.'" *Id.* at 1544. This represents one formulation of what
constitutes the timely payment of the minimum wage under FLSA.
There are other formulations of timely payment, depending on the facts.
For example, in *Olson v. Superior Pontiac–GMC, Inc.,* 765 F.2d 1570,
*modified by,* 776 F.2d 265 (11th Cir.1985), the Court of Appeals for the
Eleventh Circuit considered whether a payment scheme that applied
excess commissions earned by salesmen during one pay period to the
minimum wage for the next pay period complied with FLSA's prompt
payment requirement. The court concluded that FLSA was not violat-
ed "so long as the employee actually received the minimum wage for
each hour worked within each separate pay period." *Id.* at 1579.

The only issue we determine today is whether Section 6 of FLSA
requires the timely payment of wages. We need not and do not
consider what constitutes the timely payment of wages to Common-
wealth employees within the meaning of FLSA.

The *Biggs* court's analysis of FLSA's statutory scheme started with Section 6. Noting that Section 6 directs every employer to pay the minimum wage once an employee has performed work in any workweek with the words "shall pay," the court determined: "To us, 'shall pay' plainly connotes shall make a payment. If a payday has passed without payment, the employer cannot have met his obligation to 'pay.'" *Id.* (quoting 29 U.S.C § 206(b), now § 206(a)). The court then turned to Section 16(b), FLSA's provision that imposes liability upon an employer for violations of the Act in the amount of the unpaid minimum wages or unpaid overtime compensation, and in an additional equal amount as liquidated damages. The court was of the view that the contemplated imposition of liability would be meaningless, unless there is a distinct point after which wages become unpaid. *Id.* Referring to 29 U.S.C. § 255 (the statute of limitations for an action under FLSA for unpaid minimum wages and for liquidated damages), the court further observed that statutes of limitation have to start running from some point, and determined that the most logical point for accrual of a cause of action for unpaid minimum wages or liquidated damages under the Act is the day the employee's wages are scheduled to be paid. *Id.* at 1540. Accordingly, the court concluded logically that these FLSA provisions, when read together, necessarily assume that there is a particular day on which wages must be paid, and that thereafter, wages are unpaid, not merely late, in violation of the Act. *Id.* at 1539.

The Ninth Circuit also reasoned that its conclusion that Section 6 requires the timely payment of wages comported with the Supreme Court's decision in *Brooklyn Savings Bank v. O'Neil,* 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945), where the Court held that the Act prohibits the prospective waiver of the right in Section 16(b) to receive liquidated damages for unpaid compensation. The *Biggs* Court pointed out that the Supreme Court in *O'Neil* repeatedly referred to the employer's obligation to pay employees "on time," when writing of the Act's aims to protect certain groups from substandard wages and excessive hours, which in turn endan-

gered the nation's well-being and the free movement of goods in interstate commerce. In this regard, the Ninth Circuit took note of the following statements made by the Supreme Court in its *O'Neil* decision: (1) that Section 16(b) "constitutes a Congressional recognition that failure to pay the statutory minimum *on time* may be so detrimental to maintenance of the minimum standard of living 'necessary for health, efficiency, and general well-being of workers' and to the free flow of commerce, that double payment must be made *in the event of delay* in order to insure restoration of the worker to that minimum standard of well-being[;]" (2) that reparations are necessary for " 'failure to pay *on time* [;]' " (3) that an employee has the right to " 'recover damages from *delay* in payment' "; and (4) that " 'prompt payment to workers has long been recognized by Congress.' " *Biggs*, 1 F.3d at 1541 (quoting *O'Neil*, 324 U.S. at 707, 709, n. 20, 65 S.Ct. 895) (emphasis added by the *Biggs* Court).

We are persuaded by the well-reasoned and comprehensive analysis in *Biggs* and the other relevant federal court decisions that we have reviewed that Section 6 of FLSA contains a timely payment of wages requirement. *See Rogers v. City of Troy, New York*, 148 F.3d 52, 55 (2d Cir.1998) ("Although the FLSA does not explicitly require that wages be paid on time, the courts have long interpreted the statute to include a prompt payment requirement."); *Calderon v. Witvoet*, 999 F.2d 1101, 1108 (7th Cir.1993) (concluding that FLSA's minimum wage must be paid promptly; paying employees belatedly violates the Act). Moreover, we find the Executive Parties' contention that, without an express direction that wages be paid on time, Section 6 cannot be construed to include a prompt payment requirement, is contrary to settled principles of federal statutory construction. The construction of a federal statute is a matter of federal law. *In re: Estate of Romani*, 547 Pa. 41, 688 A.2d 703, 708 n. 18 (1997). Under federal rules of statutory construction, in determining the meaning of a federal statute, the courts look not only to particular statutory language, but also to the design of the statute as a whole and to its purposes. *Crandon v. United*

*States,* 494 U.S. 152, 158, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990). Furthermore, when the courts confront circumstances not plainly covered by the terms of a statute, suggesting that Congress did not contemplate the issue, they endeavor to give statutory language the meaning that advances the policies underlying the legislation. *United States v. Sisson,* 399 U.S. 267, 297–98, 90 S.Ct. 2117, 26 L.Ed.2d 608 (1970). Indeed, that was the case in *O'Neil.* In the absence of evidence of specific Congressional intent in the Act itself on the FLSA issue placed before it, the Supreme Court resorted to a broader consideration of the legislative policies behind the Act to render its ruling. *O'Neil,* 324 U.S. at 706–07, 65 S.Ct. 895. Thus, the absence of express language in FLSA requiring timely payment is not the end of the federal statutory construction issue, as the Executive Parties argue. For the reasons noted above, it is evident to this Court that a proper construction of the entirety of the Act and the policies behind it makes it clear that the Executive Parties' assertion that Section 6 does not contain a prompt payment requirement is unavailing and that Section 6 of FLSA mandates that wages be paid in a timely manner when the wages are regularly due to be paid.

C

We next turn to the issue of whether Section 6 of FLSA preempts Section 24. The principle of preemption is grounded in the Supremacy Clause of the United States Constitution, which, when applicable, subordinates the laws of the states to those of the federal government. *Kuznik v. Westmoreland County Bd. of Comm'rs,* 588 Pa. 95, 902 A.2d 476, 493 (2006) (citing *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)). Since *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819), it is axiomatic that "state law that conflicts with federal law is 'without effect.'" *Id.*

In determining whether state law is preempted, we adhere, as we must, to the principles the U.S. Supreme Court has set forth. *Dooner v. DiDonato,* 971 A.2d 1187, 1193

(Pa.2009). "[W]e are guided by the tenet that 'the purpose of Congress is the ultimate touchstone in every pre-emption case.'" *Id.* (quoting *Wyeth v. Levine,* —— U.S. ——, 129 S.Ct. 1187, 1194, 173 L.Ed.2d 51 (2009)). We also keep in mind that consideration of issues arising under the Supremacy Clause starts with the assumption that the historic police powers of the States are not to be superseded by federal law unless that is the clear and manifest purpose of Congress. *Id.* at 1194.

▆▆▆▆▆ The Supreme Court has instructed that Congress' intention to displace state law may be demonstrated in several different ways. *Id.* at 1193 (citing *Altria Group, Inc. v. Stephanie Good,* —— U.S. ——, ——, 129 S.Ct. 538, 543, 172 L.Ed.2d 398 (2008)). In express preemption, Congress sets forth its intent to preempt expressly in the language of the statute. *Hillsborough County v. Automated Med. Laboratories, Inc.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). In field preemption, Congress implies its intent to preempt by occupying the entire legislative area, leaving no room for supplementary state regulation. *Id.* Finally, in conflict preemption, Congress' intent to preempt is inferred where there is an actual conflict between state and federal law. Such a conflict arises where compliance with both state and federal laws or regulations is an impossibility or where state law stands as an obstacle to the accomplishments and execution of the full purposes and objectives of Congress. *Id.*

Before we apply these guiding principles to the preemption issue this case presents, we briefly discuss the Commonwealth Court's conclusion that Section 24 is not preempted. In its analysis, the court did not inquire into the different ways that Congressional intent to preempt may be conveyed. Instead, the court simply reasoned that since the payment of wages during a budget impasse would amount to the unlawful spending of state monies, Congress could never have intended for Section 24 to be displaced by Section 6 of FLSA. In so doing, the court made two fundamental mistakes. It disregarded controlling Supreme Court jurisprudence on discerning Congress' intent to preempt and it failed to recognize that when a state law is preempted, state law requirements or prohibitions

have no legal effect. Thus, the court's method of analyzing the preemption issue was lacking, and the very premise underlying its conclusion that Section 24 is not preempted by Section 6 of FLSA, *i.e.,* that Congress did not intend to countenance unlawful state spending in times of a budgetary crisis, is erroneous.

When we apply the required analytical framework to the question of whether Section 24 is preempted, based on our review of FLSA, we observe that the Act contains no explicit language that expresses Congress' intent to displace state law provisions like Section 24. Thus, we conclude that although Section 24 is not expressly preempted by FLSA, under well-settled principles of federal preemption our inquiry regarding Congress' intent to preempt is not, as the Executive Parties argue, complete and settled at this point.

Considering next the matter of field preemption, we observe that FLSA has a savings clause, which allows the states and municipalities to enact more protective wage provisions and stricter hour provisions than those included in the Act.[14] The presence of this savings clause strongly negates any perceived intention on Congress' part to occupy the entire area of wage and hour regulation, and leads us to conclude directly that Section 24 is not preempted through field preemption. *Williamson v. Gen. Dynamics Corp.,* 208 F.3d 1144, 1151 (9th Cir.2000) (determining that FLSA's savings clause evidences Congressional intent not to preempt the entire field). *See Dooner,* 971 A.2d at 1197 (observing that savings clause in Securities Exchange Act argues against field preemption).

14. FLSA states in relevant part:

No provision of this chapter or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter or a maximum work week lower than the maximum workweek established under this chapter, and no provision of this chapter relating to the employment of child labor shall justify noncompliance with any Federal or State law or municipal ordinance establishing a higher standard than the standard established under this chapter....

29 U.S.C. § 218(a).

■ Turning to conflict preemption, our examination of the operation of Section 6 of FLSA and Section 24 of Article III in the circumstances presented herein, where the Commonwealth's fiscal year has ended and where no general appropriations act has been enacted, reveals that these provisions obviously conflict. At the same time that Section 6 requires the prompt payment of wages to the Commonwealth's FLSA-covered employees, Section 24 prohibits the payment of monies out of the Commonwealth's Treasury in order to pay those wages. In these circumstances, it is impossible to comply with both Section 6 of FLSA and Section 24. Indeed, the Interagency Agreement entered by the Office of the Governor and the State Treasury Department in May of 2008, *see supra* p. 68, and the decision to furlough certain FLSA-covered employees reflected the Administration's recognition that the respective terms of both Section 6 and Section 24 could not possibly be met, if a budget impasse came to pass, and its legitimate desire to avoid violating one provision or the other in that event. In instances of such conflict, the Supremacy Clause must prevail.

Therefore, we conclude that through conflict preemption, Congress' intent for Section 6 of FLSA to preempt state law provisions such as Section 24 is manifest and clear, and that the presumption against preemption that the Executive Parties rely upon to argue that Section 6 does not displace Section 24 is presently overcome. Furthermore, since Section 24 is preempted, Section 24 is without effect in this instance and thus, ceases to have legal significance. Accordingly, we hold that the Union Parties are entitled to the declaratory judgment they sought: that Section 24 did not prohibit the Commonwealth from continuing to employ and pay all FLSA nonexempt Commonwealth employees in the event that the Pennsylvania General Assembly failed to pass a budget by July 1, 2008.

IV

We last address the Executive Parties' cross-appeal. Throughout this case, the Executive Parties have asserted

that by devising a plan in 2008 that allowed only those FLSA-covered employees who performed functions essential to the health, safety, and welfare of the public to work and be paid, the Governor sought to minimize violations of Section 24. In their Cross–Application for Summary Relief, the Executive Parties asked that the Commonwealth Court approve of the Governor's aim to limit violations of Section 24 in this way when faced with a budget impasse. Given our holding in the Union Parties' appeal, that Section 24 is preempted and without effect, the perceived dilemma which occasions the Executive Parties' argument no longer exists. Accordingly, we conclude that the Executive Parties' cross-appeal from the Commonwealth Court's Order denying this request is moot and need not be addressed. *See Powell v. Hous. Auth. of City of Pittsburgh*, 571 Pa. 552, 812 A.2d 1201, 1216 n. 17 (2002) (declining to reach issues rendered moot by holding).

## V

For the foregoing reasons, we hold as follows:

(1) At No. 66 MAP 2008, that portion of the Commonwealth Court's Order denying the Executive Parties' request in their Cross–Application for Summary Relief to dismiss the Petition is affirmed;

(2) At No. 60 MAP 2008, that portion of the Commonwealth Court's Order denying the Union Parties' Application for Summary Relief is reversed;

(3) At No. 66 MAP 2008, the Executive Parties' cross-appeal from that portion of Commonwealth Court's Order denying the request in their Cross–Application for Summary Relief for approval of minimal violations of Section 24 during a budget impasse is dismissed as moot; and

(4) The Union Parties are entitled to a declaratory judgment that Article III, Section 24 does not prohibit the Commonwealth from continuing to employ and pay all FLSA nonexempt Commonwealth employees in the event that the Pennsylvania Legislature fails to pass a budget.

Justices EAKIN, BAER, TODD and McCAFFERY join the opinion.

Justice SAYLOR files a concurring and dissenting opinion.

Justice GREENSPAN concurs in the result.

Justice SAYLOR, concurring and dissenting.

I join Parts I, II, and III(A) of the majority opinion, as I agree with the holdings that the present controversy is justiciable and that the FLSA and its wage provisions apply to the Commonwealth by virtue of *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). I respectfully disagree, however, with the majority's conclusion that the FLSA absolutely requires the Commonwealth to pay wages in a timely manner, without consideration of the existence of a budgetary impasse and the resulting fiscal limitations imposed by Article III, Section 24. *See* Majority Opinion, at 377–80, 986 A.2d at 79–81.

I find persuasive the Executive Parties' position that, "in obedience to the constitutional command of federalism to respect the sovereignty of the states, the presumption against preemption must be employed in determining not only whether Congress intended preemption at all, but also in service of striving to achieve the most 'narrow interpretation' plausible to avoid preemption of state law." Brief for Executive Parties at 31 (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 2250, 135 L.Ed.2d 700 (1996)). In this regard, and as the majority recognizes, the FLSA does not contain an express provision dictating a timeframe for the payment of wages; thus, the imposition of a timely payment requirement arises from judicial interpretation. *See Council 13, AFSCME v. Rendell*, 954 A.2d 706, 714 (Pa.Cmwlth.2008) (Leavitt, J.) (collecting cases). While this interpretation may be reasonable in the context of private employers, *see, e.g., Calderon v. Witvoet*, 999 F.2d 1101, 1108 (7th Cir.1993), its application to states that are operating in a state of fiscal crisis, in my view, implicates circumstances not contemplated by Congress in its enactment of the FLSA and fails to account for the fact that a

sovereign must continue to provide services to its citizens, even without a present means of appropriation.

That being the case, the Executive Parties convincingly advocate that a comparison of the FLSA's silence as to the question of prompt payment with the "explicit and unforgiving" mandate of Article III, Section 24, when considered in conjunction with a presumption against federal preemption, supports the conclusion that this Court should not "infer that Congress intended to require a State government, its officials and agencies to ignore a foundational pillar of its constitutional form of government by withdrawing State funds to pay wages *without approval of its Legislature.*" Brief for Executive Parties at 34 (emphasis in original). This interpretation also supports Appellants' position that the Governor's approach to furlough is within his discretionary prerogative as Chief Executive Officer, as opposed to being mandatory.